# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Sumeya Mohamed, Rukia Bile, Abdirisaq
Sheikh, Ubah Shire, Paul Stoderl, and
Sharon Martin, on behalf of themselves
and others similarly situated,

              Plaintiffs,

v.

Marquette Management, Inc., G&I X
Phoenix Apartments LLC, Kelly Delisle,
and Doci Companies,

              Defendants.

Court No.:  23-cv-1740 (JRT/JFD)

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Sumeya Mohamed, Rukia Bile, Abdirisaq Sheikh, Ubah Shire, Paul

Stoderl, and Sharon Martin ("Plaintiffs") allege as follows on behalf of themselves and

all other similarly situated tenants at The Haven of Battle Creek against Defendants

Marquette Management, Inc., G&I X Phoenix Apartments LLC, and Kelly Delisle

(collectively "Landlord Defendants"), and Doci Companies (collectively "Defendants"):

## INTRODUCTION

1.      This is a class action lawsuit brought to stop the illegal and dangerous

tenant replacement scheme that Defendants are employing at a 216-unit apartment

complex in St. Paul, Minnesota to install preferred "affinity groups" of young,

professional, well-off tenants in the complex while forcing out the preexisting racially

1

diverse low-income community with a large Muslim Somali population and a number of tenants receiving public assistance. The most dangerous element of Landlord Defendants' scheme is its mass-scale demolition and renovation activity inside the complex that violates mandatory lead paint and asbestos protections, thereby exposing vulnerable families to the risk of life-long health problems. Even worse, Landlord Defendants are using these illegal and hazardous renovations as a pretext to force Haven tenants to move from their apartments by dramatically raising rent for all units at the property.

2. Landlord Defendants' centralized scheme violates fundamental tenant protection, consumer protection, and antidiscrimination laws. Since its purchase of The Haven of Battle Creek ("Haven") in May 2021, Landlord Defendants have systematically targeted the diverse tenant community there for mistreatment and removal from Haven. Landlord Defendants' illegal scheme includes: unsafe renovations that expose tenants to lead paint and asbestos hazards; denial of basic repair, maintenance, and pest control services; deceptive new lease agreements containing illegal utility fees; hostile treatment of the racially diverse tenant population through antagonistic and demeaning communication tactics and systematic retaliation against tenants who oppose these unlawful practices. Through this scheme, Landlord Defendants seek to scare tenants away from asserting their legal rights and to scare them away from continuing to live at Haven.

3. Landlord Defendants' illegal tenant replacement scheme is a key element of a discriminatory business model that Marquette Management euphemistically calls

"Experiential Management" and "Elevated Lifestyle." On Marquette Management's YouTube channel, the president of Marquette's parent company explains the concept of "experiential management" over a video showing groups of well-off, primarily white younger adults laughing, consuming alcohol, and taking selfies together: "We create affinity groups where we find people who are likeminded and people who want to do biking or running or cooking or wine tasting and we create affinity groups around that so that residents can connect and create a sense of community." He concludes: "Marquette's experiential management creates the competitive edge that helps us to take projects from good to great."

4. The diverse low-income tenant community at Haven is unwelcome given Landlord Defendants' business strategy of creating a "competitive edge" by renting to a particular tenant population of "likeminded people" who fit into "affinity groups" with an "elevated lifestyle."

5. At its core, Landlord Defendants' tenant replacement scheme is one of intentional housing discrimination based on the race, color, religion, national origin, and public assistance status of the preexisting Haven tenant community. Landlord Defendants are particularly overt about their discriminatory animus against Haven's large Somali tenant population and tenants receiving public assistance. Landlord Defendants' staff, including Defendant Delisle, berate and yell at Somali elders who do not speak English, blame the "Somali lifestyle" for pest infestations and other habitability problems that are the product of Landlord Defendants' own neglect, and restrict residents' amenity access

because of an apparent belief that tenants on public assistance cannot be "trusted" to use those amenities responsibly.

6.　　Landlord Defendants' tenant replacement scheme is a deliberate and centralized system made up of the following components, all of which are being implemented at Haven—and all of which are unlawful:

(1) **Target high-upside "broken" properties with vulnerable tenant populations susceptible to displacement.** Landlord Defendants target for acquisition what they call high-upside "broken" properties with marginalized tenants who are vulnerable to rapid displacement because they lack the power and resources to individually resist Landlord Defendants' illegal replacement practices.

(2) **Conduct illegal and dangerous renovations that endanger the health and safety of existing tenants to lay the groundwork for a new tenant demographic.** To attract a new demographic of tenant, Landlord Defendants immediately begins conducting illegal and dangerous renovations across the complex while the existing tenants are living there.

(3) **Withhold legally required maintenance.** At the same time, Landlord Defendants withhold basic maintenance, repairs, and services for preexisting residents at the property with the goal of forcing tenants to move out because of the loss of the use and enjoyment of a habitable home.

(4) **Create a hostile living environment treating tenants in an adversarial and demeaning way that interferes with tenant efforts to protect their rights** Landlord Defendants create a hostile living environment by treating tenants as the enemy, subjecting them to demeaning statements and behavior, false accusations of lease violations, and unjustified entry into units—and restricting existing tenants from touring or applying for newly renovated apartments. Landlord Defendants retaliate against tenants who stand up to the violation of their rights and interferes with housing advocates that attempt to help tenants protect their rights.

(5) **Charge illegal fees using a deceptive lease.** Landlord Defendants require preexisting tenants to sign a confusing new lease with illegal utility fees and

hidden charges to maximize revenue and price low-income tenants out of the property.

7.     With this class action, Plaintiffs seek to stop Landlord Defendants' ongoing illegal conduct and remedy the collective harm done to them, other current and former Haven tenants, and the public in general. Plaintiffs seek injunctive relief, compensatory damages, punitive damages, and an award of attorneys' fees and costs based on Landlord Defendants' egregious violations of tenant protection, consumer protection, and antidiscrimination laws.

## PARTIES AND JURISDICTION

8.     Plaintiff Sumeya Mohamed has been a residential tenant at The Haven of Battle Creek, 200 Winthrop Street South, Unit 313, St. Paul, MN 55119, since 2015. She is Black, Muslim, and identifies as Somali. Ms. Mohamed lives with her mother Rukia Bile, and her four siblings. Ever since Defendants took control of the Haven, Ms. Mohamed's apartment has suffered from numerous maintenance issues, ranging from pest infestation to broken closet doors to a malfunctioning fire alarm. She frequently makes repair requests to Defendants, but these requests are ignored or met with an inadequate response. In June 2022, after Defendants' continued failure to perform basic maintenance, Ms. Mohamed and Ms. Bile exercised their tenant rights by sending Defendants a 14-day repair request letter on behalf of their household. A month later, Defendants retaliated against Ms. Mohamed and Ms. Bile by threatening lease termination on the basis of unidentified health and safety risks. When pressed, Defendants were unable to identify any alleged health and safety risks and retracted the

termination threat. In addition, Ms. Mohamed's household was subjected to repeated extermination notices that required the near-total clearing out of her cabinets and closets, often affording less than 24 hours for Ms. Mohamed and her mother to prepare. Further, when Ms. Mohamed complained on behalf of her household about this retaliation and raised concerns about the legality and safety of Marquette's renovation activities at Haven, Marquette's immediate reaction was to attempt to deny and conceal the fact that Ms. Mohamed was a resident at Haven, even though Marquette was fully aware that she had been a resident at Haven for years. On information and belief, Defendant Delisle went so far as to alter the information on an electronic copy of Ms. Mohamed's lease to remove Ms. Mohamed's name from the document, as shown by the metadata associated with the document. Finally, Ms. Mohamed's household has been charged apportioned utility fees.

9.     Plaintiff Rukia Bile is a residential tenant at The Haven of Battle Creek, 200 Winthrop Street South, Unit 313, St. Paul, MN 55119. She has lived at the Haven, with her family, including her daughter Plaintiff Sumeya Mohamed, since 2015. Ms. Bile is Black, Muslim, and identifies as Somali. Ms. Bile's experience at the Haven mirrors that of her daughter, Ms. Mohamed.

10.     Plaintiff Abdirisaq Sheikh has been a residential tenant at The Haven of Battle Creek, 215 South Kipling Street, Unit 244, St. Paul, MN 55119, since 2017. He is Black, Muslim, and identifies as Somali. Mr. Sheikh lives with his wife and their four children. Ever since Defendants took control of the Haven, Mr. Sheikh's apartment has

suffered from numerous maintenance issues, ranging from a rodent infestation to broken kitchen cabinets. He reports these issues to Defendants, but his requests are ignored or met with an inadequate response. When requesting repairs, Mr. Sheikh reiterates the need for reasonable notice, as his wife abides by strict religious modesty rules. Yet, when Defendants do choose to respond to Mr. Sheikh's maintenance requests, they arrive with little or no notice. In May 2022, after Mr. Sheikh requested repairs to his kitchen cabinets, Defendants sent him a letter threatening lease termination on the basis of unidentified health and safety risks. When pressed, Defendants were unable to identify any alleged health and safety risks and retracted the termination threat. Mr. Sheikh's household has been charged apportioned utility fees.

11.     Plaintiff Ubah Shire was a residential tenant at The Haven of Battle Creek, 215 South Kipling Street, Unit 447, St. Paul, MN 55119, and now resides in Woodbury, MN. She was a Section 8 voucher recipient and, from November 2016 until October 2021, lived at the Haven with her two children and her mother. Ms. Shire is Black, Muslim, and identifies as Somali. In October 2021, gunfire originating from outside of the Haven struck a pipe and flooded Ms. Shire's apartment, destroying many of her belongings. Although Defendants initially told Ms. Shire she would be able to move into a different unit within the Haven, they quickly reversed course and informed Ms. Shire she would need to immediately move or an eviction action would be filed. After being forced to leave, Ms. Shire was unable to find another apartment that would accept Section 8 and, as a result, lost her voucher. To add insult to injury, Ms. Shire—who had never

even signed a new Marquette lease after Defendants took over the property—was sent an unlawful utility bill, in excess of $250, for electricity used by Defendants in the cleaning of her apartment.

12. Plaintiff Paul Stoderl has been a residential tenant at The Haven of Battle Creek, 215 South Kipling Street, Unit 241, St. Paul, MN 55119, for over twelve years. He receives a subsidy to help pay his rent. After Defendants purchased Haven, Mr. Stoderl began seeing unexpected charges appear on his account. With the help of tenant advocates, Mr. Stoderl exercised his tenant rights by requesting a copy of his lease. Shortly thereafter, Defendants began sending to Mr. Stoderl—who had previously reported no issues with rodents—monthly extermination notices that required the near-total clearing out of his cabinets and closets. These notices often afforded less than 24 hours for Mr. Stoderl to prepare. Following one of the purported extermination visits, Defendants sent Mr. Stoderl a letter threatening lease termination on the basis of unidentified health and safety risks. Defendants had previously sent Mr. Stoderl a letter threatening lease termination on the basis of unlawful fees. Neither lease termination letter had merit and Mr. Stoderl resolved each with the assistance of housing advocates. Mr. Stoderl has been charged apportioned utility fees.

13. Plaintiff Sharon Martin has been a residential tenant at The Haven of Battle Creek, 215 Kipling Street, St. Paul, MN 55119, for over two decades. She has lived in various units within Haven, but most recently occupies unit 257. Ms. Martin is 78 years old and relies on a walker to get around. Her rent is subsidized through the federal

Housing Choice Voucher program. In July 2023, Ms. Martin's previous apartment (unit 250) was flooded from above after the unit above her was renovated and she was forced to move units. In response to Ms. Martin being uprooted from her home, Defendant Delisle told Ms. Martin that "she knew she'd have to move eventually." Finally, Ms. Martin has been charged apportioned utility fees.

14.     Defendant Marquette Management, Inc. ("Marquette" and "Marquette Management") is a real estate management company incorporated in Illinois, with its principal place of business at 135 Water Street, 4th Floor, Naperville, IL 60540. Marquette Management manages Haven under an agreement with and as an agent of G&I X Phoenix Apartments, LLC, and controls all aspects of the property management, maintenance, and renovation at Haven.

15.     Defendant G&I X Phoenix Apartments, LLC ("G&I Phoenix") owns and operates Haven in St. Paul, Minnesota. G&I Phoenix is a Delaware limited liability company doing business as The Haven of Battle Creek with its principal place of business at 200 Winthrop Street South, St. Paul, MN 55119.

16.     Defendant Kelly Delisle is the on-site property manager at Haven. Delisle is employed by Defendant Marquette and is responsible for the day-to-day property management at Haven. Delisle is a citizen of Minnesota and resides year-round in Minnesota at 599 Kendall Drive, Hastings, MN 55033 and 5068 State 87 SW, Backus, MN 56435. According to her own email signature block, Defendant Delisle is "Property Manager" and "Agent for Owner" at Haven at Battle Creek:



As on-site property manager for Haven and agent for owner G&I Phoenix, Defendant Delisle directly manages the facilities and services at Haven, including maintenance, renovation, pest control, leasing, tenant communications, rent and utility fee charges, rent collection, towing, and licensing/certification. She also manages adverse actions against tenants including violation notices, termination notices, and evictions. Finally, she manages communications and responses with inspectors and other government officials.

17.     Defendant Doci Companies ("Doci") is a construction and property management company incorporated in Illinois, with its principal place of business at 1384 Mitchell Boulevard, Schaumburg, IL 60193. Marquette Management contracted with Doci to perform extensive demolition and renovation at Haven.

18.     Landlord Defendants are each subject to liability for the statutory violations of landlord-tenant law set forth in this Complaint under Chapter 504B, which defines "landlord" as "an owner of real property, . . . agent, or other person directly or indirectly in control of rental property." Minn. Stat. § 504B.001, subd. 7. Defendant G&I Phoenix

is the owner of the Haven rental property, Defendant Marquette Management and Defendant Delisle are agents of the owner, and all three are persons directly or indirectly in control of the rental property at Haven.

19.     This Court has personal jurisdiction over Defendants because Defendants do business in Minnesota, own property in Minnesota, and/or have committed acts in Minnesota that have caused injury to Minnesota residents.

20.     Federal jurisdiction exists in this case because it has been removed to the U.S. Court for the District of Minnesota under 28 U.S.C. §§ 1332, 1446, 1453.

## FACTS

**A.      Landlord Defendants' Illegal Tenant Displacement Scheme at Haven.**

21.     At the heart of this class action is a centralized system of unlawful practices implemented by Landlord Defendants at Haven that has one overarching purpose: to displace the existing disfavored tenant community and replace it with a tenant population that Landlord Defendants views as racially, ethnically, and economically desirable.

22.     The following paragraphs outline the key components of the illegal tenant replacement system Landlord Defendants are executing at Haven—all of which violate Minnesota and federal laws enacted to protect the rights of tenants, consumers, and protected classes of persons.

23.     Marquette Management has been managing and investing in multi-family properties for over 30 years. One of Marquette's primary business strategies it implements is a "value add" strategy in which Marquette identifies and acquires "broken"

properties with "clear path[s] to increased rent." (Ex. A.)[1] At the time of acquisition, Marquette routinely creates a new corporate shell ownership entity (in this case G&I Phoenix), institutes new management systems, shifts the cost of utilities onto tenants, and begins making cheap and illegal renovations to common areas and vacated units to change the look of the property to one that is attractive to more affluent renters.

24. Marquette Management's value-add strategy hinges on changing the demographic makeup of the tenant population. On Marquette Management's YouTube channel, the president of Marquette's parent company explains the concept of "Experiential Management" that he says differentiates Marquette from other real estate management companies: "We create affinity groups where we find people who are likeminded and people who want to do biking or running or cooking or winetasting and we create affinity groups around that so that residents can connect and create a sense of community."[2] Marquette's philosophy of "experiential management" has no place for the racial, ethnic, religious, and economic diversity among tenants that exists at Haven.

25. Marquette Management markets Haven apartments in a manner calculated to replace preexisting tenants with younger, more affluent tenants and families. On the Haven website, Marquette advertises an "Elevated Lifestyle" and "New Renovations" with "modern interior" finishes "to accommodate even the most refined taste," highlighting features such as granite countertops, slate appliances, espresso-colored

---

[1] All Exhibits attached to this Complaint are referenced as "Ex. __."
[2] https://www.youtube.com/watch?v=Y8ZleEyniQA

cabinets, brushed-nickel fixtures, and tile shower surround.[3] Marquette also promotes

Haven's new "resort inspired" community amenities, which include a newly-renovated

indoor pool, a redesigned clubhouse with resident lounge, a renovated fitness center, and

"work from home" tech stations that are "coming soon."[4] These amenities cater to young

professionals, who are proportionally much less diverse than the preexisting tenant

population in terms of race, color, religion, national origin, and public assistance

status. Moreover, Marquette offers a "preferred employer" leasing program, in which

employees of select employers, including 3M, Medtronic, and Xcel Energy, can receive

$200 off their first month's rent.[5] Marquette's leasing specials confirm that they are

seeking a different tenant population for their renovated units than currently exists. The

clear and predictable consequence of Marquette's cosmetic renovations, "experiential

management," and "elevated lifestyle" marketing of renovated units is that a tenant

population comprised of a large share of minority tenants in protected classes will be

replaced by a tenant population consisting of young professionals likely to be largely

white and not in need of public assistance.

26. Thus, a core aspect of Marquette's value-add strategy is to replace

unwanted tenant populations with preferred "affinity groups" as quickly as possible.

Marquette is especially aggressive about its tenant replacement efforts because the tenant

populations at the "broken" properties it acquires are occupied by marginalized tenants

---

[3] https://www.havenofbattlecreek.com/; https://www.havenofbattlecreek.com/amenities
[4] https://www.havenofbattlecreek.com/amenities
[5] https://www.havenofbattlecreek.com/preferredemployerprogram

who are vulnerable to rapid displacement because they lack the power and resources to individually resist Marquette's illegal replacement practices. Landlord Defendants are executing this tenant replacement strategy at Haven, as described below.

**B.      Defendants' illegal renovation at Haven endangers the health and safety of tenants.**

27.      The most dangerous component of Landlord Defendants' tenant replacement system is their use of on-site demolition and renovation to lay the groundwork for displacing the preexisting tenant population at Haven. Landlord Defendants are engaged in this illegal renovation in active combination with Defendant Doci on an ongoing basis. The following facts are common to all Plaintiffs and Haven tenants.

28.      Haven is an apartment building built between 1976 and 1977 and is legally presumed to contain lead and asbestos material throughout the complex. The presumption that lead and asbestos are present in the complex can only be overcome with extensive lead and asbestos testing specified by regulation—testing that Landlord Defendants and Defendant Doci have failed to perform since beginning their comprehensive renovation activity at Haven in 2021. Defendants' illegal renovation continues in full force today, jeopardizing the health and safety of existing Haven tenants by subjecting them to the known risk of lead paint and asbestos exposure.

29.      The long-term dangers of exposure to lead paint and asbestos are well-established. Even low levels of lead paint exposure can have grievous effects on the

health of children and adults, and exposure to airborne asbestos fibers substantially increases the risks of lung diseases that can take years to manifest themselves.

30. Landlord Defendants are aware that the tenant population at Haven contains dozens of children, as well as many seniors and disabled persons, who are especially vulnerable to the adverse impact of exposure to lead and asbestos.

31. As the owner and property managers of a residential building doing construction with occupants present, Landlord Defendants must comply with health and safety laws enacted to protect the tenants and public from unsafe living conditions in the course of renovation, maintenance, and repair activities, including but not limited to the Renovation, Repair and Painting ("RRP") Rule, 40 C.F.R. § 745, subp. E (lead paint protection); the Lead Poisoning Prevention Act and its associated rules, Minn. Stat. §§ 144.9501-.9512, Minn. R. 4761.2000-.2700 (same); Occupational Safety and Health Act (OSHA) regulations, 29 C.F.R. §§ 1910.1001, 1926.1101 (asbestos protection); state OSHA regulations, Minn. R. 5205.0660, 5207.0035 (same); the Asbestos Abatement Act, Minn. Stat. §§ 326.70-.81 (same); Minn. R. 7035.0805 (protection against hazardous materials in renovation and demolition); Ramsey County, Minn., Hazardous Waste Management Ordinance § 3.06 (protection against hazardous materials in waste disposal); Ramsey County, Minn., Solid Waste Ordinance § 15 (same); the Minnesota Building Code, Minn. R. 1300.0120, .0210 (inspection and permitting requirements for repair); the St. Paul Building Code, St. Paul, Minn., Legislative Code § 33.03 (same); and

the St. Paul Property Maintenance Code, St. Paul, Minn., Legislative Code §§ 34.08, .09, .10 (maintenance requirements for interior and exterior of apartment dwellings).

32. As construction contractors and agents of Landlord Defendants, Defendant Doci must comply with these same laws when conducting renovation.

33. The RRP Rule illustrates the stringent nature of these laws. The RRP Rule protects building occupants from lead paint exposure construction that could disturb painted surfaces and expose occupants to lead hazards. The RRP Rule mandates that property management companies and contractors performing renovation, repair, or painting in residential buildings built before 1978, such as Haven, are (1) EPA-certified renovators who (2) employ trained workers, (3) follow extensive lead-safe work practices, (4) provide advance notice to all tenants in the vicinity of the work area, and (5) document compliance with all lead-safe work practices. *See* 40 C.F.R. §§ 745.80, .81(a)(3), .84, .85, .86, .89(d)(1)-(5).

34. As the EPA has recently stated: "[P]roperty management companies (PMCs) that perform, offer, or claim to perform regulated renovations in pre-1978 housing or child-occupied facilities are required to obtain certification from the EPA and ensure that renovations in the homes they manage are performed by certified firms and employees trained to use lead-safe work practices. . . . [The] EPA plans to hold both the PMCs and the contractors they hire responsible for compliance if the circumstances

indicate that both entities performed or offered to perform renovations for compensation in target housing or child-occupied facilities."[6]

35.     Minnesota law also expressly requires that any "residential building contractor, residential remodeler, manufactured home installer, or residential roofer" "performing renovation as defined by [the RRP Rule], on a residential structure constructed prior to 1978 must be certified in accordance with [the RRP Rule]." Minn. Stat. § 326B.106, subd. 14.

36.     Equally important, asbestos exposure during renovation is regulated under federal and state OSHA regulations. These laws place an affirmative burden on property owners, managers and contractors to ensure that tenants are not exposed to dangerous levels of asbestos during renovation and repair work. *See, e.g.*, 29 C.F.R. § 1926.1101(k), (n); Minn. R. 5205.0660; Minn. R. 5207.0035. Among their responsibilities, property owners and managers must identify as presumed asbestos-containing material any thermal system insulation, surfacing material, or vinyl flooring installed prior to 1981.[7] 29 C.F.R. § 1926.1101(b), (k)(1)(i), (k)(2). Property owners and managers can rebut the asbestos presumption only through the use of specified testing requirements. *Id.*

_____

[6] https://www.epa.gov/newsreleases/epa-affirms-building-managers-responsible-lead-based-paint-safety-requirements-when

[7] "Surfacing material" presumed to contain asbestos "means material that is sprayed, troweled-on or otherwise applied to surfaces (such as acoustical plaster on ceilings and fireproofing materials on structural members, or other materials on surfaces for acoustical, fireproofing, and other purposes)." *Id.* §1926.1101(b). "Thermal system insulation" presumed to contain asbestos includes materials "applied to pipes, fittings, boilers, breeching, tanks, ducts or other structural components to prevent heat loss or gain." *Id.*

§ 1926.1101(k)(5). Property managers and owners must retain any records concerning the identification of presumed asbestos-containing materials, along with any documentation that may demonstrate that those materials are not asbestos-containing. *Id.* § 1926.1101(n)(5)-(6).

37.     Landlord Defendants and Defendant Doci are fully aware of their legal duties to protect Haven tenants (and their own workers) from presumed lead paint and asbestos exposure under these health and safety laws. Landlord Defendants attach to the standard Haven lease[8] a "Protect Your Family from Lead in Your Home" pamphlet, which explains in detail the dangers to children and adults of disturbing lead paint and describes the certification and lead-safe practice requirements of the RRP rule when disturbing lead paint in a pre-1978 building (although there is no signature affirming that these pamphlets have been received by tenants—a violation of lead paint protection law in itself, *see* 24 C.F.R. § 35.92(4), (6)). (Ex. B, at 1-6) Landlord Defendants' standard lease also contains an "asbestos addendum," in which Landlord Defendants acknowledge that they are required by law to take precautions to minimize damage and disturbance of asbestos-containing materials. (Ex. B, at 28)

38.     Defendant Doci is an experienced construction company with years of knowledge concerning the lead and asbestos safety laws that govern renovation in the multi-unit apartment building context. According to Doci's website, the construction company has "over 15 years of experience" "specializ[ing] in stunning remodeling

---

[8] A copy of the original standard lease is attached as Ex. B.

projects on both single and multifamily projects."[9] Defendant Doci's website also includes a testimonial from the COO of Marquette Management describing the long-term "partnership" between Marquette and Doci on renovation projects: "We have been working with Doci Construction for over nine plus years and I have to say [it] has been one of the best partnerships Marquette has had. It is truly a partnership in the success of both companies. There has never been a time where Doci hasn't stepped up to help us, especially in those unique situations we find ourselves in."[10]

    39.     Landlord Defendants have also been placed on express notice by an independent environmental consultant that lead and asbestos are present in the Haven building they are renovating. Landlord Defendants have in their possession a 2017 environmental assessment by Nova Consulting Group ("2017 Nova Report"),[11] commissioned by a prior owner of the property, that expressly warns that prior testing has confirmed the presence of asbestos in the ceilings and lead coatings in bathtubs at Haven, specifically highlighting them as "issues of environmental concern":

> The following issues of environmental concern were identified in connection with the Property:
>
> - Previous sampling identified asbestos in textured ceiling plaster within the Site building and lead in the coating of original vintage bathtubs. Operations and Maintenance Programs are reportedly in place to manage the identified building materials. The observed building materials and painted surfaces were generally in good condition at the Site.

---

[9] https://docicompanies.com/our-company/

[10] https://docicompanies.com/services/

[11] The relevant portions of the 2017 Nova Report referenced in this Amended Complaint are taken from Greg Myers' supplemental expert report, included as Exhibit G.

40.     On information and belief, the 2017 Nova Report came into the possession or control of Landlord Defendants before they took over operation of Haven during the extensive due diligence they conducted beginning in 2019 before purchasing the Haven complex. Yet Landlord Defendants failed to disclose the contents of this report to tenants, prospective tenants, and governmental agencies for years.

41.     Instead, for over two years, Landlord Defendants and Defendant Doci have systematically violated lead and asbestos safety laws when conducting renovation at Haven. Since taking over the complex in 2021, Landlord Defendants and Defendant Doci have jointly engaged in millions of dollars of illegal renovation activity throughout the property, including, but not limited to the demolition of the pool room so that it could be upgraded and its back wall replaced with windows from ceiling to floor, full interior renovations (floors, cabinets, paint, appliances, closet doors, etc.) of dozens of units, flooring replacement in dozens of units, roof and siding repairs, replacement of electrical panels in all 216 units, interior and exterior painting, and the replacement of common area and patio doors. Defendants have concrete plans for equally comprehensive ongoing renovation at Haven through 2024.

42.     During their illegal renovation activity, Defendants have knowingly and deliberately violated lead and asbestos safety law despite repeated warnings about the health and safety importance of  complying with those laws. In addition to the 2017 Nova Report, Defendants have been put on notice of these violations in a letter on behalf of

Plaintiff Mohamed sent to Landlord Defendants in August 2022; the initial Complaint in this case filed in May 2023; the detailed expert report of Greg Myers attached to the initial Complaint; and written submissions and oral arguments received by Landlord Defendants during St. Paul administrative proceedings related to rent stabilization in August 2023.

43.     Although they are well aware of the regulatory requirements, neither Landlord Defendants nor Doci have obtained the mandatory certifications, licensing, and training to perform the demolition and renovation work in a building presumed by law to have lead paint and asbestos material throughout. And none of the demolition and renovation work conducted by Landlord Defendants and Defendant Doci at Haven complies with the extensive tenant notification, on-site safety, and recordkeeping requirements of the lead paint and asbestos laws.

44.     The expert report of Greg Myers dated February 28, 2023, "Marquette Management's Noncompliance with Lead and Asbestos Safety Law at The Haven of Battle Creek, St. Paul, MN," attached as Exhibit C, documents and analyzes the past and ongoing violations of lead and asbestos laws by Defendants at Haven. In it, Mr. Myers explains that the extensive renovations being performed by Defendants are of the type that require compliance with various state and federal lead and asbestos laws. Yet, after physically inspecting Haven and reviewing pictures, videos, and other documents pertaining to Defendants' renovation, Mr. Myers found no evidence that Landlord Defendants or Doci complied with the applicable safety laws. Among its violations,

Defendants failed to isolate work areas, use proper ventilation, ensure that potentially contaminated waste was disposed of properly, and maintain the required renovation records. Further, Mr. Myers concludes that Defendants' comprehensive violations of lead and asbestos laws throughout Haven's common areas and apartment units pose a real and continued risk to the health and safety of Haven's tenants.

45. The supplemental report of Greg Myers dated August 28, 2023, attached as Exhibit G, provides further analysis of the past and ongoing violations of lead and asbestos laws at Haven by Defendants in light of the recently produced 2017 Nova Report.

46. Here is the key warning regarding the asbestos risk at Haven in the 2017 Nova Report—a warning that Landlord Defendants have blatantly ignored:

---

**4.9    Asbestos-Containing Building Materials (ACBM)**

Historically suspect asbestos-containing building materials noted during the Property visit included flooring and mastic, ceiling tile, textured ceiling plaster, sheetrock and taping compound, and roofing materials. The roof was not observed during Nova's reconnaissance. Prior sampling and testing for asbestos was completed in 1996 and asbestos was detected in textured ceiling plaster from apartment units and hallways. These materials were generally in good condition at the time of Nova's site reconnaissance. Reportedly, an Operations and Maintenance Plan (O&M) was prepared for the Property in 1996. The current site manager, Lea Gilson, was unaware of an O&M Plan in place at the property.

Prior to demolition or renovation activities, previously untested suspect asbestos-containing materials, if identified, that are likely to be impacted should be sampled by a licensed asbestos inspector and analyzed by an accredited laboratory.

---

47. As discussed by Mr. Myers, contrary to the warnings in the 2017 Nova Report, Landlord Defendants disturbed the exact materials identified in the report as known and suspect asbestos-containing at Haven: textured ceilings, flooring, mastic, sheetrock and taping.

48.     Here is the key warning regarding lead hazards in the 2017 Nova Report—once again, a warning that Landlord Defendants have blatantly ignored:

### 4.10   Lead Based Paint

In accordance with the Scope of Services, Nova has conducted a limited, visual evaluation to note the condition of painted surfaces at the Property. Due to the date of construction (1977), lead-based paint may be present. The objective of this visual survey was to note the presence and condition various painted surfaces. Prior sampling and testing completed in 1996 identified lead-containing enamel coating on a bathtub. The identified lead-containing surface was reported to be in good condition and the reports indicated the material is managed in an O&M Plan reportedly in place for the building. In general, the painted surfaces appeared in good condition, as no chalking, peeling or flaking paint was observed.

The Property falls under the definition of *Target Housing*, and is regulated under Title X. The seller or renter of the Property will need to make available a federally approved lead hazard information pamphlet and must disclose known lead-based paint and/or lead-based paint hazards to purchasers and renters of the Property pursuant to the requirements of 24 CFR 35.92 and 40 CFR 745.113.

49.     Contrary to the instructions found in the 2017 Nova Report, Landlord Defendants resurfaced suspect lead-containing bathtubs using an uncertified renovation firm and concealed from Haven tenants known lead hazards before and after leasing. And even though they know about the presence of lead in Haven bathtubs, Landlord Defendants have falsely represented to tenants in the legally required lead disclosure statement in their standard lease agreements that "Lessor has no knowledge of lead-based paint and/or lead-based paint hazards are present in housing" and "Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing":

**Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards**

**Lead Warning Statement**

*Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.*

**Lessor's Disclosure**

(a) Presence of lead-based paint and/or lead-based paint hazards (*check (i) or (ii) below*):

(i) ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

_____
_____
_____
_____
_____
_____

(ii) ☒ Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the lessor (check (i) or (ii) below):

(i) ☐ Lessor has provided the lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

_____
_____
_____
_____
_____
_____

(ii) ☒ Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

(Ex. B, at 6)

50.     Landlord Defendants' failure to disclose the presence of lead-based paint at Haven is a fundamental violation of the lead disclosure laws in the Residential Lead-Based Paint Hazard Reduction Act, 42 U.S.C. § 4852d, and associated regulations—a violation the 2017 Nova Report itself warned Landlord Defendants about when it stated that "the seller or renter of the Property will need to disclose known lead-based paint and/or lead-based paint hazard to purchasers and renters of the Property pursuant to the requirements of 24 CFR 35.92 and 40 CFR 745.113."

51.     Beyond lead and asbestos laws, Defendants have also violated the health and safety building permit laws in the St. Paul City Code and the Minnesota Building

24

Code by failing to secure legally required building and construction permits. City ordinance mandates that "No person shall construct, enlarge, alter, repair, move, [or] demolish . . . a building or structure without first obtaining a building permit from the building official." St. Paul Building Code, St. Paul, Minn., Legislative Code § 33.03(a); *see also* Minn. R. 1300.0120. Maintenance repairs or minor alterations are exempted from building permits only if the cost of such repairs or alterations falls below $500. *Id.* Moreover, plumbing, electrical, and mechanical work requires a permit. *Id.* § 33.03(b)-(d); § 34.09(4)(d), (i). Since beginning renovation on Haven in mid-2021, Defendants have performed millions of dollars of "construct[ion], enlarge[ment], alter[ation], repair, move[ment], [or] demoli[tion]" of the "building and structure[s]" at Haven, but have only secured a handful of permits that cover limited work. Thus, Defendants have engaged in sweeping violations of City permitting law.

52. In sum, Defendants have systematically endangered the health and safety of the Plaintiffs and all Haven residents by violating numerous health and safety regulations in the course of their ongoing renovation work at the complex. In doing so, Defendants have deliberately and intentionally disregarded the legal rights of Plaintiffs and other Haven tenants and disregarded the substantial likelihood of serious injury and damages to Plaintiffs and other Haven tenants.

**C.  Landlord Defendants Withhold Legally Required Maintenance at Haven.**

53. At the same time Landlord Defendants unlawfully renovate common areas and vacated units, they deliberately cause building-wide habitability problems to persist

by failing to control and eliminate pest infestation, meet fire safety requirements, and obtain proper rental certification from the City of St. Paul.

54. Landlord Defendants cause ongoing pest infestation problems to persist throughout the building complex even though St. Paul ordinances make the landlord of a residential property "responsible for the control and/or elimination of insects, rodents or other pests wherever infestation exists." St. Paul, Minn., Legislative Code § 34.10(6). Since Landlord Defendants took control of Haven, tenants throughout the building have sought treatment for continued infestation of mice, cockroaches, and hornets, and numerous tenants have submitted complaints concerning infestation to the City of St. Paul. Despite this, Landlord Defendants have failed to invest in the systematic pest elimination methods necessary to abate the rampant, complex-wide infestation. As recently as August 4, 2023, Defendant Delisle informed a pest control company that the "roaches and mice are getting out of control again," admitting both to the current pest infestation crisis at Haven and the fact that it is a reoccurring event.

55. The following excerpt from a lengthy Pest Control Log maintained by Landlord Defendants starting in December 2022 gives a sense of how pest infestation is occurring across the complex and on all floors of the complex—including a note for one unit that reads "Mice 'Caught 15'":

## Pest Control Log

| Date | Apt | Name | Reporting |
|------|-----|------|-----------|
| 12/2 | 207 | ■■■ | Roaches |
| 12/3 | 103 | ■■■ | Roaches - early |
| 12/5 | 371 | ■■■ | mice + Roaches |
| 12/5 | 265 | ■■■ | mice |
| 12/6 | 231 | ■■■ | mice |
| 12/9 | 213 | ■■■ | Roaches |
| 12/12 | 457 | ■■■ | mice |
| 12/15 | 103 | ■■■ | Roaches |
| 12/17 | 122 | ■■■ | Mice |
| 1/4 | 448 | ■■■ | mice / Roaches |
| 1/6 | 441 | ■■■ | u Mice "Caught 15" |
| 1/9 | 248 | ■■■ | mice |
| 1/17 | 108 | ■■■ | mice / Roaches "On Patio" |
| 1/20 | 466 | ■■■ | Mice / Roaches |
| 1/23 | 327 | ■■■ | mice |
| 1/27 | 323 | ■■■ | Mice |
| 2/8 | 208 | Vacant | mice / Roaches |
| 3/14 | 436 | ■■■ | needed Mice !!! |
| 3/17 | 207 | ■■■ | Roaches - bathroom & kitchen |
| 2/20 | 242 | ■■■ | mice |
| 3/8 | 242 | ■■■ | Mice |

56.     Landlord Defendants also put tenants' lives in danger by allowing Haven's smoke detectors to remain in a state of disrepair. In September 2022, more than a year after Landlord Defendants took control of Haven and after the City had twice advised Landlord Defendants to service Haven's fire alarm system, City inspection staff

27

responded to a faulty fire alarm and reported that there were "numerous smoke detectors on the 2nd, 3rd and 4th floors of the [building's east] side that have what appears to be tape holding the detectors together."

57. Moreover, Landlord Defendants failed to obtain a valid certificate of occupancy as the owner and property manager of Haven until almost two years after they purchased Haven in May 2021. This is a violation of St. Paul Code § 40.01, which states that:

> All existing buildings in the city are required to have and maintain a fire certificate of occupancy, issued by the department of safety and inspections. The fire certificate of occupancy shall be an indication that the building meets, at the time of inspection, all relevant codes to maintain the health, safety and welfare of the building's occupants and the general public.

Section 40.09 also requires that "[t]he owner of a building for which a fire certificate of occupancy has been issued is under a continuing obligation to give written notice to the department of safety and inspections of . . . any changes or modifications of ownership of the building, property manager or responsible party," and that "[a] new owner of a building with a fire certificate of occupancy shall file with the department of safety and inspections a written application for a modification of the certificate . . . within thirty (30) days after such new owner obtains new ownership in the building." Landlord Defendants did not comply with the requirement that it obtain a fire certificate of occupancy until on or about April 2023. Further, this certificate was procured only through Marquette's misrepresentations and omissions to the City of St. Paul about its compliance with health

and safety laws during inspections and other communications with the City's Department of Safety and Inspection about code compliance at Haven in 2022 and 2023.

**D.  Landlord Defendants Illegally Charge Haven Tenants Apportioned Utility Fees.**

58.     Haven is a "single-metered residential building" for its utilities and therefore regulated by Minn. Stat. § 504B.215. In single-metered residential buildings, unlike buildings with meters for each unit, it is not possible to measure each resident's use of a given utility. Only the entire building's usage (including the common areas like lobbies and hallways) can be measured. Under Minn. Stat. § 504B.215, landlords of such buildings can choose to include the cost of the utilities in the rental payments or they can divide up the utility costs amongst their tenants (called "apportionment") and charge utilities separately from tenants' rent **if they comply with Minnesota's utility billing law** codified at Minnesota Statutes § 504B.215.

59.     Section 504B.215 is the Minnesota Statute designed to protect tenants from the risk of unfair landlord practices in charging tenants for the use of utilities not directly measured with respect to their units. Under section 504B.215, landlords must disclose at least the following if they want to charge tenants for an apportioned share of the building's utility expenses:

60.     **Pre-leasing notice**: Prior to a tenant signing a lease with an apportioned utility charge, the landlord must provide prospective tenants to that lease with information about the building's utility usage and costs so that the tenant can decide if the likely utility charges will be affordable in addition to their rent (subd. 2a(a)(1)

("must provide prospective tenants notice of the total utility cost for the building for each month of the most recent calendar year")).

61. **Apportionment method**: The landlord must provide in the lease the predetermined method for apportioning the utility expenses amongst its tenants in writing *and* the method must be "equitable" (subd. 2a(a)(2) ("predetermine and put in writing for all leases an equitable method of apportionment and the frequency of billing by the landlord")).

62. Further, subdivision 2a(b) requires that "[b]y September 30 of each year, a landlord of a single-metered residential building who bills for gas and electric utility charges separate from rent must inform tenants in writing of the possible availability of energy assistance from the Low Income Home Energy Assistance Program."

63. Under section 504B.215, the landlord must satisfy all of these requirements before it can impose any fee on tenants for the use of shared utilities.

64. After it took over the Haven complex, Landlord Defendants rapidly moved to requiring a new standard lease agreement that attaches a utilities addendum which charges tenants apportioned fees for gas, water, and sewer utilities "based on a combination of square footage of your apartment and the number of persons residing in your apartment." (Ex. B, at 21, ¶1) The addendum also charges for shared trash utilities at a flat fee of $10 per month.

65. In instituting these new utility charges to tenants, Landlord Defendants have violated multiple requirements of section 504B.215 and therefore are illegally

charging Plaintiffs and other Haven tenants for apportioned utilities. The following facts are common to all Plaintiffs and Haven tenants.

66.     First, prior to requiring Plaintiff and all Haven tenants to enter into new leases containing a utilities addendum charging apportioned utilities—at which time those residents are "prospective tenants" with respect the new leases—Landlord Defendants have failed to provide to them "notice of the total utility cost for the building for each month of the most recent calendar year" for the gas, water, sewer, and trash utilities. This is a violation of Minn. Stat. § 504B.215, subd.2a(a)(1), which thus prohibits Landlord Defendants from charging and collecting for these apportioned utilities.

67.     Second, Landlord Defendants have failed to "predetermine and put in writing for all leases an equitable method of apportionment" with respect to its charges for its pass-through utilities. The utilities addendum does not include the required disclosure of the specific "predetermine[d]" "equitable method of apportionment" for any of these utility charges, only stating that tenant charges for gas, water, and sewer are apportioned "based on a combination of square footage of your apartment and the number of persons residing in your apartment." This statement discloses almost no meaningful information about the "predetermine[d]" "equitable method of apportionment" for these utilities: For any individual unit, how is the value of an individual unit's "square footage" calculated across a property with 216 units and vast common areas and other areas kept off-limits to tenants? How is the value of each resident living in a unit calculated across a property with many hundreds of tenants and

outside persons using utilities? What are the proportions of the "square footage" and "number of persons" in the "combination" of those two values? Moreover, the addendum states that the tenant "may be paying for part of the utility usage in common areas or other residential units"—another undisclosed factor in the apportionment method that makes tenants pay for part of the property that they may not be using. Presumably, there is an actual predetermined method for apportionment of shared utilities that Landlord Defendants or their vendor can consistently and repeatedly apply to arrive at a mathematically sound calculation of apportioned utility fees for each unit at Haven. However, no such method is disclosed in the utility addendum.

68.     Further, when Plaintiffs Mohamed and Stoderl recently requested a detailed description of Marquette's apportionment method, Defendant Delisle failed to provide the actual methodology, instead stating in vague terms in an email (and without providing any supporting documentation) that "in calculating the amount to be apportioned to each unit, 50% of the amount allocated to each unit is based on the number of identified occupants in the unit, and 50% of the amount allocated to each unit is based on the square footage of the unit." This nebulous explanation (1) reveals that the Landlord Defendants have withheld even this limited information about their apportionment method from the lease and (2) still leaves the actual method for calculating the apportionment of utility bills as a black box.

69.     Moreover, on information and belief, the actual predetermined apportionment method used by the Landlord Defendants at Haven is not equitable—as

evidenced by the ongoing obfuscation and evasion by the Landlord Defendants in disclosing their actual predetermined apportionment method. Landlord Defendants' failure to predetermine an equitable apportionment method is a violation of Minn. Stat. § 504B.215, subd. 2a(a)(2).

70.     Third, Landlord Defendants are "landlord[s] of a single-metered residential building who bill[] for gas . . . charges separate from rent" who have repeatedly failed to meet their obligation to "inform tenants in writing of the possible availability of energy assistance from the Low Income Home Energy Assistance Program," in violation of Minn. Stat. § 504B.215, subd. 2a(b).

71.     Under section 504B.215, the foregoing violations of subdivisions 2a are also violations of Minn. Stat. § 504B.161 and § 504B.221.

**E.     Landlord Defendants Misrepresent Compliance with Health and Safety Law and Utility Law to Haven tenants.**

72.     Landlord Defendants engage in ongoing systematic misrepresentations to Plaintiffs and Haven tenants about its compliance with health and safety and utility laws. The following facts are common to every Plaintiff and tenant at Haven.

73.     First, Landlord Defendants provide a standard Haven lease to prospective tenants during the leasing process that expressly represents to each tenant that they are and will maintain the Haven apartments "in compliance with the applicable health and safety laws of the State of Minnesota, . . . and of the local units of government where the apartment is located." (Ex. B, at 11, ¶32)

74.     In providing this standard lease to tenants, Landlord Defendants also makes statutorily implied covenants of habitability to each tenant that they are and will "maintain the premises in compliance with the applicable health and safety laws of the state, and of the local units of government where the premises are located during the term of the lease or license." Minn. Stat. § 504B.161, subd. 1(a)(4).

75.     As part of this standard lease, the utility addendum also expressly represents to each tenant that "no [utility] billing method, charge, or fee mentioned here will be used in any jurisdiction where such use would be unlawful." (Ex. B, at 21, ¶11)

76.     As alleged in this Amended Complaint, Landlord Defendants' representations regarding their compliance with health and safety laws and utility law are false. Moreover, Landlord Defendants engage in fraudulent omissions at the time of leasing by failing to disclose that they are violating these laws and are concealing those violations from Plaintiffs and all other Haven tenants.

77.     Landlord Defendants also engage in fraudulent omissions when charging and collecting rent and fees by failing to disclose that they are violating health and safety laws relating to lead, asbestos, pest infestation, fire safety, building permits, and rental certification, as well as violating utility fees law.

78.     The individuals making these misrepresentations and omissions directly to Plaintiffs and tenants regarding compliance with health and safety law and utilities law are Defendant Delisle, Marquette's on-site property manager and agent for owner, and staff acting at her direction, including Cierrah Huntington and Stephanie Hannahs.

Further, all Landlord Defendants make these misrepresentations and omissions through these individuals.

79.    Landlord Defendants have special knowledge that they are failing to comply with health and safety laws relating to lead, asbestos, pest infestation, fire safety, building permits, rental certification, and utility fees.

80.    Landlord Defendants have special knowledge that they are fraudulently concealing from Haven tenants their violations of health and safety laws relating to lead, asbestos, pest infestation, fire safety, building permits, rental certification, as well as the law relating to utility fees.

81.    Landlord Defendants have a duty to say enough to prevent their words from being misleading when offering leases, signing leases, and charging and collecting rent and fees from tenants. This means that Landlord Defendants were required to disclose to Plaintiffs and the other Haven tenants during these events that they were violating health and safety laws relating to lead, asbestos, pest infestation, fire safety, building permits, rental certification, as well as the law relating to utility fees.

82.    Landlord Defendants intend for Plaintiffs and all other Haven tenants to rely on these misrepresentations and omissions about their compliance with health and safety law and utility law.

83.    Plaintiffs and all other Haven tenants rely on the actual and represented legal ability of Landlord Defendants to charge and collect the rent and utility fees when they pay the rent and utility fees to Landlord Defendants.

84.    Causation of damages to Plaintiffs and all other Haven tenants is also demonstrated by the following facts: (1) Landlord Defendants' misrepresentations and omissions have been longstanding, pervasive, and widespread at Haven; (2) Landlord Defendants intended and understood that tenants would rely on its communications in the context of leasing and charging and collecting rent and utility fees; and (3) information contained in official documents and communications by Landlord Defendants are the kind that a tenant would typically rely upon.

**F.    Landlord Defendants Are Committing Housing Discrimination Against Haven Tenants.**

83.    At its heart, Landlord Defendants' unlawful conduct at Haven is motivated by ongoing intentional housing discrimination based on the race, color, religion, national origin, and public assistance status of the preexisting Haven tenant community.

84.    The unsafe and unlawful provision of facilities and services described above are driven by Landlord Defendants' core business plan at Haven to replace the preexisting racially diverse low-income community with "affinity groups" of young, professional, well-off tenants in the complex.

85.    Another critical component of this discriminatory tenant replacement system is to create a hostile living environment by telling tenants that they are being monitored by a "community watch," blaming them for habitability problems that are Marquette's responsibility, pretextually towing tenant vehicles even though there is ample parking, and making unjustified entries into units on inadequate notice, among other acts of aggression and intimidation.

86.     The animus of Landlord Defendants is often specifically directed at Somali tenants. On multiple occasions, on-site Defendant Delisle and her Haven staff have told both Somali and non-Somali tenants that the pest problem at Haven is a result of the Somali "lifestyle" and that the Somali tenants caused Haven's pest infestation.

87.     In discussions regarding the pest problem, Defendant Delisle told Plaintiff Mohamed that Landlord Defendants "can't do anything if the Somali population—no offense to you and your family—don't clean." She went on to blame the supposed "strong odors" of spices commonly used in Somali cooking for attracting the mice. Defendant Delisle also told Plaintiff Shire that she wanted to "teach the Somalis how to clean properly," and asked if Plaintiff Shire would translate her training into Somali.

88.     In another instance, a Somali tenant reported an unbearable smell that turned out to be a deceased neighbor. Rather than investigate the source of the smell, Landlord Defendants' staff suggested that the smell was a result of the tenant family's poor hygiene, asking—in between laughs—if the smell was from the tenant's clothes or perhaps was from one of her children urinating in the apartment. Landlord Defendants' staff, including Defendant Delisle, have also yelled at and made derogatory statements about Somali tenants who do not speak English.

89.     The majority of Haven's Somali tenants are Muslims, a fact known by Landlord Defendants. Yet Landlord Defendants foster a culture of disfavor towards their Muslim tenants. For example, disregarding the modesty requirements of some Muslim tenants, Landlord Defendants' staff arrive at tenant apartments with little or no notice and

make derogatory suggestions about tenants' attire. Landlord Defendants have invested hundreds of thousands of dollars to renovate the pool—an amenity which may be difficult for Muslim tenants to fully enjoy because of modesty requirements—while ignoring the routine maintenance requests of the current tenant base. Landlord Defendants' staff have brought a dog into the leasing office and allowed it to run and jump on tenants. When Plaintiff Shire explained to Defendant Delisle that many in the Muslim community believe dog saliva is impure and do not want to come into contact with it, Defendant Delisle responded "is it because the saliva is evil?" Landlord Defendants' staff post Christmas-themed messages on Haven's Facebook page and decorate the leasing office for Christmas and Easter, yet fail to recognize or celebrate any major Islamic holiday. Moreover, Landlord Defendants failed to provide an apology or acknowledgement to their tenants when anti-Islamic propaganda was, on information and belief, distributed widely throughout the building.

90.    Landlord Defendants' animus extends to residents who receive public assistance. For example, upon the reopening of the illegally renovated pool and fitness center, Landlord Defendants reduced these amenities' open hours to just 10am to 5:30pm. When a tenant asked why the amenity hours are so limited, Landlord Defendants' on-site staff responded that management cannot trust "certain tenants," but that once Landlord Defendants stopped accepting Section 8 tenants, the amenity hours would expand. Landlord Defendants have also failed to properly maintain the units of tenants that receive a rental subsidy. Units throughout Haven have failed housing quality inspections

designed to ensure the health and safety of subsidized tenants. The habitability concerns identified ranged from inoperable outlets and leaking plumbing, to torn carpets and pest infestation. Finally, Landlord Defendants give tenants with rental subsidies misleading letters that improperly threaten eviction and late fees based on the subsidy provider's portion of rent. Defendant Delisle and her staff send these letters to tenants despite knowing that the unpaid rent listed is attributable solely to the subsidy provider.

91.     Landlord Defendants also create a hostile living environment by restricting current tenants from touring and applying for newly renovated units. In March 2023, Landlord Defendants publicly advertised an "open house" to tour newly renovated units. When Plaintiff Mohamed expressed interest in attending the open house, Defendant Delisle told her that "it's not for residents" and expressed surprise that Ms. Mohamed had found out about the open house. Ms. Mohamed then used the Haven website to schedule a tour of a 3-bedroom renovated unit, which was immediately confirmed by "Marq" a "virtual leasing agent." Thirty minutes later, Defendant Delisle emailed Ms. Mohamed and told her that she would not be able to tour a 3-bedroom apartment because Landlord Defendants did "not have any available," even though Ms. Delisle—in the same email— had said three 3-bedroom units would be available in late April, May, and June respectively, and Haven's standard lease expressly permits tours of occupied units after a notice to vacate is given. While Ms. Delisle stated that a 1-bedroom unit was available to tour, she did so with knowledge that a unit of this size would not be large enough for Ms. Mohamed's household. By limiting who can tour and apply for renovated units, Landlord

Defendants restrict access to continued and improved housing for current tenants and make clear that current tenants are unwanted in the "new" Haven.

92.    Another critical component of the Landlord Defendants' tenant replacement system is to interfere with and retaliate against tenants who assert their legal rights, as well as to interfere with housing advocates that attempt to help tenants protect their rights.

93.    Landlord Defendants systematically respond to repair requests from tenants with communications threatening lease termination because the tenant's apartment was "posing multiple health and safety risks," without identifying what the alleged "health and safety risks" are, why the household is responsible for them, or how these issues had come to Marquette's attention. (Ex. E)

94.    Landlord Defendants respond to tenant complaints regarding maintenance problems by having pest control companies make seemingly random visits to units in the building without providing adequate notice or flexibility about rescheduling. Defendant Delisle and her staff order housing advocates who are door-knocking about tenant-rights meetings to leave Haven property. Defendant Delisle and her staff take down flyers posted inside Haven that advertise tenant-rights meetings. Defendant Delisle sends out mass emails to Haven tenants instructing them not to attend meetings sponsored by housing advocates that are designed to provide Haven tenants with information about their civil rights and tenant rights. (Ex. F)

95.     For those tenants who are able to connect with housing advocates, Landlord Defendants attempt to threaten and intimidate them into silence. For example, in March 2023, housing advocates and tenant leaders, including Plaintiffs Mohamed, Martin, and Stoderl, held a tenants-only meeting to discuss Marquette's rent-increase application. On information and belief, Defendant Delisle directed someone to attend and covertly record the meeting. Days later, in a conversation with Plaintiff Martin, Defendant Delisle made direct reference to her participation in the March meeting and threatened her. By engaging in such intimidation, Landlord Defendants communicate to all Haven tenants that exercising their legal rights comes with a cost, thereby chilling all Haven tenants from asserting their rights.

96.     Landlord Defendants accelerated their tenant replacement strategy at Haven late last year by issuing a mass "Notice to All Residents" on November 30, 2022, threatening to terminate the residency of the hundreds of tenants who are living in unrenovated apartments as part of "building wide, universal, plans for needed renovation" ("Displacement Notice"). (Ex. D) The Displacement Notice stated: "We are now moving to a stage in our renovation plans where residents that have leases ending may . . . need to vacate when their lease ends." It stated: "It is Management's plan to remove the original [] units from rental availability and renovate all [] original apartments." It stated: "This notice also serves as a communication to you that there are no substantially equivalent replacement units available to you for transfer at the building." Finally, the Displacement Notice made it clear that any current tenant who

wants to apply for a newly renovated unit must first finish out their current lease and give

notice of intent to vacate their current unit and then go through an entirely new, onerous

application process (with a new $50 application fee and $150 administrative fee) that will

"be screened in accordance with Management's current screening criteria, including

qualification for a unit at the renovated rental rates." The letter clearly signaled that most

tenants will not be permitted to return to renovated units by "assur[ing] that any rental

reference we give to a future owner or screening service will make it clear that your

tenancy was terminated in connection with building wide, universal, plans for needed

renovation."

97.     Landlord Defendants' Displacement Notice is replete with deceptive and

intimidating statements intended to cause preexisting tenants to leave the property. And

this scheme has been successful. On information and belief, hundreds of preexisting

tenants have moved out of Haven since Landlord Defendants took control of the property

in May 2021, with a substantial portion of those tenants having moved out after receiving

the Displacement Notice.

98.     After distributing the Displacement Notice in November 2022, Landlord

Defendants applied to the City of St. Paul for a rent increase of more than 25%. In

making this application, Landlord Defendants are attempting to convince the City of St.

Paul to approve a significant rent increase for tenants that would otherwise be prohibited

under St. Paul's rent stabilization ordinance by concealing and misrepresenting their

comprehensive violations of lead and asbestos safety law and other health and safety laws. If granted, these rent increases will further force preexisting tenants out of Haven.

99.     Landlord Defendants' discrimination against Plaintiffs and other tenants is intentional. To show intentional housing discrimination based on protected status, a plaintiff must simply produce direct or circumstantial evidence that a discriminatory reason likely motivated the challenged housing-related decision. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). Among the many facts showing Landlord Defendants' intentional discrimination are the following:

100.    **Adverse impact against protected classes.** The adverse impact of Landlord Defendants' disfavored-tenant replacement scheme on the protected classes at Haven is indisputable. A significant majority of preexisting tenants at Haven are Somali, African-American, Muslim, and/or recipients of public assistance such as Section 8 vouchers or other forms of rental assistance. The percentage of nonwhite tenants at Haven is far greater than St. Paul's general population, which is over 51% white, non-Hispanic or Latino, and only 16% black or African-American alone.[13] Indeed, the Somali population alone, from the beginning of 2022 to the beginning of 2023, occupies between 31% and 37% of the units at Haven, and, given the relatively large size of Somali households, likely makes up more than half of the overall tenant population at Haven. Moreover, a vast majority of Haven's Somali tenant population is Muslim. In addition,

---

[13] https://www.census.gov/quickfacts/stpaulcityminnesota

tenants living in older units at Haven are even more likely to be in protected classes and in apartments designated for Section 8 housing. Thus, Marquette's strategy of targeting displacement of tenants from older units, limiting the ability of existing tenants to apply for or even tour renovated apartments, withholding maintenance from older units, performing illegal renovations and maintenance on older units, creating a hostile living environment with special animus toward protected classes, retaliation for asserting legal rights, imposing illegal utility fees, and other wrongful conduct at Haven has a grossly disproportionate impact against people who identify as Somali or black, people of the Islamic faith, and people using public assistance.

101.    **Adverse impact against protected classes is the knowing and intended result of Haven's actions.** Landlord Defendants are fully aware that their wrongful actions are having an adverse impact on tenants in these protected classes, and they are presumed to intend those results. In discrimination law, the "impact of an [adverse] action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997).

102.    **Landlord Defendants' explicit statements reveal animus against protected classes.** Marquette's "experiential management" and "elevated lifestyle" business model is a barely disguised statement of policy for intentional discrimination against classes of persons who do not fit their "elevated" tenant demographic. At Haven, Landlord Defendants describe their property management strategy as a "battle plan"

44

against the existing tenant population. Defendant Delisle and her on-site staff explicitly blame Somali residents for pest infestations and other habitability problems that are Landlord Defendants' responsibility, and yell at and berate elderly Somalis who do not speak English. In addition, Defendant Delisle and her staff limit tenant access to newly renovated amenities because they believe that residents who receive Section 8 cannot be "trusted" to responsibly use them. Clearly, "a reasonable jury could conclude that the intent to discriminate is implicit in these comments. There are no talismanic expressions which must be invoked as a condition-precedent to the application of laws designed to protect against discrimination." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996) (citation omitted).

103. **Landlord Defendants' deception and dishonesty about material facts.** Discriminatory motive is shown by Landlord Defendants' repeated deceptive and pretextual statements ranging from misrepresentations about their compliance with health and safety law, to falsely blaming tenants for their own habitability violations, to concealing that the renovations at the heart of their tenant replacement plans are illegal and dangerous. "[T]he trier of fact can reasonably infer from the falsity of the explanation that the [discrimination defendant] is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 147 (2000).

104. **Landlord Defendants' departure from their own purported principles and procedures.** Marquette describes its property management business as one "[d]istinguished by the Core Values of Synergy, Excellence, Authenticity, and Customer Centricity, Marquette employees embrace these principles in everyday operations, from prospective renter tours to executive business decisions."[14] It then defines the core values of "Customer Centric" as "Extraordinary service from the inside out"; "Excellence" as "Passionate commitment to quality"; and "Authenticity" as "Real, genuine, respectful relationships."[15] Landlord Defendants incorporate some of these procedures and principles in their lease agreement when they promise to comply with governing health and safety and utility laws. Yet in sharp deviation from these corporate principles and procedures, Landlord Defendants have provided the diverse tenant community at Haven with unsafe and unlawful facilities and services and a hostile living environment in which tenants face retaliation if they attempt to stand up for their rights. Moreover, Landlord Defendants' dehumanizing treatment of tenants in protected classes is a marked departure from the diversity and inclusion statement on Marquette's website, in which it boast that it "celebrate[s] the unique backgrounds and lived experiences of" its residents and "strive[s] to provide a safe and supportive environment where people from all walks of life can thrive."[16] The environment Landlord Defendants have created at Haven is the opposite of this diversity and inclusion statement.

---

[14] https://www.marquettemanagement.com/our-story
[15] *Id.*
[16] *Id.*

**G.    Plaintiffs' Private Attorney General Status and Public Benefit.**

105.    Minn. Stat. § 8.31, subd. 3a, empowers "any person injured by a violation of any of the laws referred to in subdivision 1" to become a private attorney general who "may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court." Subdivision 1 identifies "the law of this state respecting unfair, discriminatory, and other unlawful practices in business, commerce, or trade" as being enforceable by the private attorney general. Thus, all claims brought in this Complaint respecting unfair, discriminatory, and other unlawful practices in business, commerce, and trade are brought pursuant to the private attorney general powers granted by Minn. Stat. § 8.31, subd. 3a.

106.    Prosecution of this lawsuit as private attorney general is consistent with recent efforts by the Minnesota Attorney General to protect tenants from violation of Minnesota tenant protection and consumer protection laws, including landlords who engage in widespread habitability violations, deceptive conduct that harms tenants, and improper utility charges. This lawsuit will provide a significant public benefit because the injunction and declaratory relief it seeks against Landlord Defendants' ongoing wrongful practices will go beyond protecting Plaintiffs, but will also help protect other Haven tenants, Haven guests, Marquette and Doci's own personnel exposed to unsafe renovation, tenants at other Marquette properties in Minnesota, and the public in general. In addition, stopping Landlord Defendants' discriminatory practices has a critical public

benefit because, as the Minnesota Legislature has emphasized, ongoing discrimination "menaces the institutions and foundations of democracy." Minn. Stat. § 363A.02, subd. 1(b). Finally, it is clear that Defendants will not voluntarily stop their illegal practices without the prospect of injunctive relief and the imposition of damages and attorneys' fees that force them to recalculate the costs of their ongoing unlawful business practices.

**H.     Defendants' Unlawful Conduct Has Caused Injury to Plaintiffs.**

107.    Plaintiffs and other Haven tenants have been proximately injured by Defendants' systematic unlawful conduct because they have paid rent and utility fees that Landlord Defendants were legally prohibited from charging and collecting.

108.    In addition, Landlord Defendants have injured Plaintiffs and all other Haven tenants by acting with deliberate disregard for the rights and safety of others in violation of Minn. Stat. § 549.20, subd. 1, entitling Plaintiffs to seek punitive damages under this statute.

109.    Landlord Defendants (1) have knowledge of facts and intentionally disregards facts that create a high probability of injury to the rights or safety of others and (2) have deliberately proceeded to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others with respect to the following unlawful conduct:

- Knowingly exposing Haven tenants—including a significant tenant population of children, seniors, and disabled persons—to known and presumed hazardous lead

and asbestos materials when performing renovations that will disturb those materials, as alleged herein.

- Knowingly violating health and safety laws relating to lead and asbestos protection, as alleged herein.

- Knowingly misrepresenting and concealing from tenants known and presumed lead and asbestos materials at Haven, as well as the fact that renovation will disturb those materials, as alleged herein.

- Knowingly misrepresenting and concealing violation of health and safety laws related to lead and asbestos protection, as alleged herein.

- Knowingly violating apportioned utility fee law, as alleged herein.

- Knowingly misrepresenting and concealing the violation of utility fee law, as alleged herein.

110.    Defendant Doci (1) has knowledge of facts and intentionally disregards facts that create a high probability of injury to the rights or safety of others and (2) has deliberately proceeded to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others with respect to their role aiding and abetting and conspiring with Landlord Defendants concerning the following unlawful conduct:

- Knowingly exposing Haven tenants—including a significant tenant population of children, seniors, and disabled persons—to known and presumed hazardous lead

and asbestos materials when performing renovations that will disturb those materials, as alleged herein.

- Knowingly violating health and safety laws relating to lead and asbestos protection, as alleged herein.

- Knowingly misrepresenting and concealing from tenants known and presumed lead and asbestos materials at Haven, as well as the fact that renovation will disturb those materials, as alleged herein.

- Knowingly misrepresenting and concealing violation of health and safety laws related to lead and asbestos protection, as alleged herein.

## I.  Class Allegations.

111.    Plaintiffs bring this action individually on behalf of all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

112.    Plaintiffs seek to represent a class defined as all persons who have resided at Haven at some point since May 17, 2021.

113.    The following persons would be excluded from the class and potential subclasses: (1) any Judge or Magistrate Judge presiding over this action and the members of their family; (2) Defendants, Defendants' employees, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5)

Plaintiffs' counsel and Defendants' counsel, and their experts and consultants; and (6) the legal representatives, successors, and assignees of any excluded persons.

114.   The proposed class contains members so numerous that separate joinder of each member of the class is impractical. There are hundreds of proposed class members.

115.   There are questions of law and fact common to the proposed class because all of Plaintiffs' claims assert common legal claims theories against Defendants based on common evidence that Defendants use systematic unlawful conduct to target the entire Haven tenant population on a building-wide basis, as alleged herein.

116.   The claims of Plaintiffs are typical of those of the proposed class.

117.   Plaintiffs will fairly and adequately protect the interests of members of the proposed class.

118.   The undersigned counsel is committed to, and capable of, vigorous representation of the class.

119.   This action is maintainable as a class action because the prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent or varying adjudications, as well as waste limited judicial resources.

120.   Defendants have acted on grounds generally applicable to the class, under a cohesive set of operative facts, thus making injunctive relief and corresponding declaratory relief appropriate with respect to the class.

121.    Common questions of law and fact predominate over questions affecting only individual members of the proposed class. These common legal and factual questions arise from central issues that do not vary from class member to class member, and which may be determined without reference to the individual circumstances of any particular class member.

122.    A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical.  It would be unduly burdensome to separately litigate hundreds of individual claims.

123.    Each class member's injuries, though personally significant, are too small to make the prosecution of individual actions economically feasible.

124.    In the alternative, Plaintiffs reserve the right to ask that this action be maintained as a class action with respect to particular issues and/or a class divided into subclasses with each subclass treated as a class.

## CLAIMS

### COUNT ONE
### BREACH OF LEASE/STATUTORY COVENANTS OF HABITABILITY
### MINN. STAT. § 504B.161

125.    Plaintiffs restate and reallege all other paragraphs in this Amended Complaint as if fully stated and alleged herein.

126.    Minn. Stat. § 504B.161, subd. 1, requires a landlord to "maintain the premises in compliance with the applicable health and safety laws of the state, and of the

local units of government where the premises are located during the term of the lease or license[.]"

127.    Landlord Defendants are each subject to liability for the statutory violations of § 504B.161 at Haven because each is a "landlord" as defined in Chapter 504B— namely, "an owner of real property, . . . agent, or other person directly or indirectly in control of rental property." Minn. Stat. § 504B.001, subd. 7. Defendant G&I Phoenix is the owner of the Haven rental property, Defendant Marquette Management and Defendant Delisle are agents of the owner, and all three are persons directly or indirectly in control of the rental property at Haven.

128.    Landlord Defendants make a closely similar promise in the "Responsibilities of Owner" section of each lease.

129.    Landlord Defendants' past and ongoing actions as set forth above in Sections B, C, and D violate Minn. Stat. § 504B.161, subd. 1. Landlord Defendants' conduct violates applicable health and safety laws, including laws related to lead paint and asbestos protection, building permits, pest control, and fire safety, rental certification, as well as apportioned utility law.

130.    Landlord Defendants' actions breach the promises detailed in the "Responsibilities of Owner" section in their standard lease to tenants.

131.    Landlord Defendants' past and ongoing actions caused Plaintiffs injury and damages, and threaten to cause further injury, entitling Plaintiffs to the requested remedies in this Complaint.

**COUNT TWO**
**HOUSING DISCRIMINATION**
**MINNESOTA HUMAN RIGHTS ACT, MINN. STAT. § 363A.09**

132.   Plaintiffs restate and reallege all other paragraphs in this Amended

Complaint as if fully stated and alleged herein.

133.   The Minnesota Human Rights Act, Minn. Stat. § 363A.09, subd. 1(1),

states:

> It is an unfair discriminatory practice for an owner, . . . or managing agent of, or other person having the right to sell, rent or lease any real property, or any agent of any of these: to refuse to sell, rent, or lease or otherwise deny to or withhold from any person or group of persons any real property because of race, color, creed, religion, national origin, sex, marital status, status with regard to public assistance, disability, sexual orientation, or familial status[.]

134.   The Minnesota Human Rights Act, Minn. Stat. § 363A.09, subd. 1(2),

states:

> It is an unfair discriminatory practice for an owner, . . . or managing agent of, or other person having the right to sell, rent or lease any real property, or any agent of any of these: to discriminate against any person or group of persons because of race, color, creed, religion, national origin, sex, marital status, status with regard to public assistance, disability, sexual orientation, or familial status in the terms, conditions or privileges of the sale, rental or lease of any real property or in the furnishing of facilities or services in connection therewith . . . [.]

135.   Further, Minn. Stat. § 363.09, subd. 6 states:

> It is an unfair discriminatory practice for a person to coerce, intimidate, threaten, or interfere with a person in the exercise or enjoyment of, or on account of that person having exercised or enjoyed, or on account of that person having aided or

encouraged a third person in the exercise or enjoyment of, any right granted or protected by this section.

136.    Landlord Defendants are all subject to liability under the Minnesota Human Rights Act because they are an "owner," "managing agent," and/or "other person having the right to sell, rent or lease any real property, or any agent of any of these."

137.    Landlord Defendants' conduct described herein constitutes discrimination against tenants because they are refusing to continue to lease and otherwise denying or withholding housing from persons and groups of persons because of race, color, religion, national origin, and/or status with regard to public assistance.

138.    Landlord Defendants' conduct described herein constitutes discrimination against tenants because of race, color, religion, national origin, and/or status with regard to public assistance in the furnishing of facilities or services in connection with the rental or lease of real property.

139.    Landlord Defendants' discriminatory intent is shown through the actions summarized in Section F of this Complaint.

140.    Landlord Defendants' conduct described herein constitutes a discriminatory practice to coerce, intimidate, threaten, and interfere with Haven tenants in the exercise or enjoyment of their civil rights under section 363A.09, as well as third party housing advocates in the aid and encouragement of such civil rights.

141.    Landlord Defendants' past and ongoing discriminatory conduct has caused

Plaintiffs injury and damages, and threaten further injury, entitling Plaintiffs to the

requested remedies in this Complaint.[17]

**COUNT THREE**
**HOUSING DISCRIMINATION**
**FAIR HOUSING ACT, 42 U.S.C. §§ 3604 & 3617**

142.    Plaintiffs restate and reallege all other paragraphs in this Amended

Complaint as if fully stated and alleged herein.

143.    The Fair Housing Act, 42 U.S.C. § 3604 states:

It shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

144.    Further, the Fair Housing Act, 42 U.S.C. § 3617 states:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having

---

[17] With respect to the discrimination claims in this case, Landlord Defendants' intentional discrimination against tenants in protected classes at Haven not only causes injury and damage to those tenants but to the entire tenant community. "Discriminatory laws, policies, or actions will often have negative effects (whether intended or not) on individuals who do not belong to the disfavored group. This does not, however, change the fact that such laws, policies, or actions are discriminatory when they are undertaken for the purpose of harming protected individuals." *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1158-62 (9th Cir. 2013).

> aided or encouraged any other person in the exercise or
> enjoyment of, any right granted or protected by section 3603,
> 3604, 3605, or 3606 of this title.

145. Landlord Defendants are subject to liability under 42 U.S.C. §§ 3604 and 3617 because they are individuals, owners and/or agents of owners of Haven who have engaged in conduct described herein prohibited by 42 U.S.C. §§ 3604, 3617 in the course of operating their rental business.

146. Landlord Defendants' conduct described herein constitutes discrimination against tenants because they are making unavailable and denying housing to persons and groups of persons because of race, color, religion, and/or national origin.

147. Landlord Defendants' conduct described herein constitutes discrimination against tenants because of race, color, religion, and/or national origin in the furnishing of facilities or services in connection with the rental or lease of real property.

148. Landlord Defendants' discriminatory intent is shown through the actions summarized in Section F of this Amended Complaint.

149. Landlord Defendants' conduct described herein constitutes a discriminatory practice to coerce, intimidate, threaten, and interfere with Haven tenants in the exercise or enjoyment of their civil rights under section 3617, as well as third party housing advocates in the aid and encouragement of such civil rights.

150. Landlord Defendants' past and ongoing discriminatory conduct has caused Plaintiffs injury and damages, and threaten further injury, entitling Plaintiffs to the requested remedies in this Complaint.

**COUNT FOUR**
**CONSUMER FRAUD**
**MINN. STAT. §§ 325F.69-.70**

151.　Plaintiffs restate and reallege all other paragraphs in this Amended
Complaint as if fully stated and alleged herein.

152.　The Consumer Fraud Act, Minn. Stat. § 325F.69, subd. 1, prohibits the
"act, use, or employment by any person of any fraud, [] false pretense, false promise,
misrepresentation, misleading statement or deceptive practice, with the intent that others
rely thereon in connection with the sale of any merchandise."

153.　The lease of real property constitutes the sale of merchandise under Minn.
Stat. § 325F.68.

154.　Recognizing the "lack of affordable residential housing and the inequality
of the bargaining power between residential landlords and tenants, particularly low and
moderate income tenants," Minnesota courts have applied the Minnesota Consumer
Fraud Act "to halt the use of deceptive landlord practices which take advantage of an
already unequal bargaining position." *Love v. Amsler*, 441 N.W.2d 555, 559 (Minn. Ct.
App. 1989), *rev. denied* (Minn. Aug. 15, 1989).

155.　Landlord Defendants engage in ongoing systematic misrepresentations and
fraudulent omissions to Plaintiffs and the other Haven tenants regarding their compliance
with health and safety and utility laws when entering into leases and charging and
collecting rent. The core facts related to the "who, what, where, how, and when" of the

misrepresentations are set forth below and in Section E of the Amended Complaint, and they are common to all Plaintiffs and other Haven tenants:

156. **Who**: The persons making these misrepresentations and fraudulent omissions directly to Plaintiffs and tenants regarding compliance with health and safety law and utilities law are Defendant Delisle, Marquette's on-site property manager and agent for owner, and staff acting at her direction, including Cierrah Huntington and Stephanie Hannahs. In doing so, Defendant Delisle acts individually and on behalf of other Landlord Defendants.

157. **What**: Intentional misrepresentations and fraudulent omissions of material and discernable facts to Plaintiffs and the other Haven tenants communicating that:

  a. Landlord Defendants maintain Haven with actions that comply with health and safety laws relating to lead, asbestos, pest infestation, fire safety, building permits, and rental certification, when in fact Defendants' renovation, maintenance, and rental certification actions systematically violate those laws.

  b. Landlord Defendants are charging apportioned utility fees that comply with Minnesota utility law, when in fact they are systematically violating that law.

158. **Where:** Express misrepresentations and fraudulent omissions are made at the Haven complex in St. Paul, Minnesota—where they occur in person, via written document, via email, and/or via web portal.

159.    **When:** Express misrepresentations and fraudulent omissions are made to each Plaintiff and the other Haven tenants (1) at the relevant times when Landlord Defendants and tenants enter into new leases and (2) at the relevant times when Landlord Defendants charge and collect monthly rent and utility fees.

160.    **How:** Express misrepresentations are made in new lease agreements that falsely represent that (1) Landlord Defendants will maintain the Haven apartments "in compliance with the applicable health and safety laws of the State of Minnesota, . . . and of the local units of government where the apartment is located" and (2) "no [utility] billing method, charge, or fee mentioned here will be used in any jurisdiction where such use would be unlawful." Fraudulent omissions are made by failing to disclose material information that (1) Landlord Defendants are engaged in acts that violate health and safety laws relating to lead, asbestos, pest infestation, fire safety, building permits, and rental certification, and (2) Landlord Defendants are charging apportioned utility fees that violate utility law.

161.    Landlord Defendants are all subject to liability under Minn. Stat. § 325F.69 because Defendants are a "natural person," "employee," "agent," "company," and/or business entity engaging in acts prohibited by the statute, 325F.68, subd. 3.

162.    Landlord Defendants have special knowledge that they are failing to comply with health and safety laws relating to lead, asbestos, pest infestation, fire safety, building permits, rental certification, and utility fees.

163. Landlord Defendants have special knowledge that they are fraudulently concealing from Haven tenants their violations of health and safety laws relating to lead, asbestos, pest infestation, fire safety, building permits, rental certification, and utility fees.

85. Landlord Defendants have a duty to say enough to prevent their words from being misleading when offering leases, signing leases, and charging and collecting rent and fees from tenants. This means that Landlord Defendants were required to disclose to Plaintiffs and the other Haven tenants during these events that they were violating health and safety laws relating to lead, asbestos, pest infestation, fire safety, building permits, rental certification, as well as the law relating to utility fees.

164. Landlord Defendants intend for Plaintiffs and all other Haven tenants to rely on their intentional misrepresentations and omissions about their compliance with health and safety law and utility law.

165. Plaintiffs and the other Haven tenants rely on the actual and represented legal ability of Landlord Defendants to charge and collect the rent and utility fees when they pay the rent and utility fees to Landlord Defendants.

166. Causation of damages to Plaintiffs and the other Haven tenants is also demonstrated by the following facts demonstrating causal nexus between Landlord Defendants' fraudulent conduct and injury to Plaintiffs and the other Haven tenants: (1) Landlord Defendants' misrepresentations and omissions have been longstanding, pervasive, and widespread at Haven; (2) Landlord Defendants intended and understood

that tenants would rely on its communications in the context of leasing and charging and collecting rent and utility fees; and (3) information contained in official documents and communications by Landlord Defendants are the kind that a tenant would typically rely upon.

167.    This consumer fraud claim has a significant public benefit because (1) it seeks injunctive relief that would protect the health and safety of Haven tenants and have far reaching impact beyond just the Plaintiffs, (2) goes well beyond one-to-one transactions because Landlord Defendants systematically misrepresent compliance with health and safety laws and utility laws to all tenants and prospective tenants, as well as governmental officials and the public in general, and (3) seeks to stop ongoing consumer fraud that Landlord Defendants are unwilling to stop even after litigation has been commenced.

168.    In addition to the private attorney general statute of Minn. Stat. § 8.31, subd. 3, this claim is brought pursuant to Minn. Stat. § 325F.70, which went into effect on August 1, 2023 and provides Plaintiffs a private cause of action for a consumer fraud claim. Section 325F.70 expressly states that "[a]n action brought under this section benefits the public."

169.    Landlord Defendants' actions have caused Plaintiffs injury and damages, and threaten to cause further injury to Plaintiffs, entitling Plaintiffs to the requested relief in this Complaint.

170. Defendants knew or should have known that their conduct was directed to one or more senior citizens or disabled persons. One or more senior citizens or disabled persons are more vulnerable to Defendants' conduct than other members of the public because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and actually suffered physical, emotional, or economic damage resulting from the Defendants' conduct. Defendants' conduct caused senior citizens or disabled persons to suffer damages. In addition to foregoing damages, Defendants are subject to civil penalties under Minn. Stat. § 325F.71, subd. 2 for each violation.

## COUNT FIVE
## UNCONSCIONABLE AND UNFAIR ACT
## MINN. STAT. §§ 325F.69-.70

171. Plaintiffs restate and reallege all other paragraphs in this Amended Complaint as if fully stated and alleged herein.

172. Minnesota Statutes section 325F.69, subdivision 1, was recently amended, effective August 1, 2023, to prohibit unfair or unconscionable practices, which are defined as any "act [] or practice that: (1) offends public policy as established by the statutes, rules, or common law of Minnesota; (2) is unethical, oppressive, or unscrupulous; or (3) is substantially injurious to consumers." Minn. Stat. § 325F.69, subd. 8.

173. Landlord Defendants have committed, on an ongoing basis, intentionally unconscionable and unfair acts and practices against Plaintiffs and the other Haven tenants that include the following:

a. Creating dangerous and substandard living conditions to force disfavored tenants to move out of Haven.

b. Conducting unlawful renovation that endangers the health of a tenant population which contains large numbers of children, seniors, and disabled persons.

c. Failing to disclose the known presence of lead in Haven bathtubs and asbestos in Haven ceilings to Haven tenants, even though these materials were being disturbed during renovation and could be disturbed by tenants during occupancy.

d. Creating an oppressive living environment at Haven through intimidation and retaliation, as alleged above.

e. Applying to the City of St. Paul for a rent increase of greater than 25% even though there were extensive violations of health and safety law occurring at Haven that Landlord Defendants have concealed from the City.

f. Charging illegal utility fees that ratchet up further financial pressure on low-income tenants.

174. These wrongful acts and practices have offended public policy as established by the statutes, rules, and common law of Minnesota; were unethical, oppressive, or unscrupulous; and were substantially injurious to consumers.

175. These wrongful acts and practices are managed and carried out at Haven by Defendant Delisle acting individually and on behalf of the other Landlord

Defendants.

176.     These wrongful acts and practices were undertaken with the intent that Plaintiffs and the other Haven tenants would accept and rely on them while living at Haven and continuing to pay rent and utility fees.

177.     There is a causal relationship between the injuries suffered by Plaintiffs and the other tenants living at Haven and the wrongful conduct Landlord Defendants have engaged in that violates the foregoing provisions of Minn. Stat. § 325F.69.

178.     This claim has a significant public benefit because (1) it seeks injunctive relief that would protect the health and safety of Haven tenants and have far reaching impact beyond just the Plaintiffs, (2) goes well beyond one-to-one transactions because Landlord Defendants systematically misrepresent compliance with health and safety laws and utility laws to all tenants and prospective tenants, as well as governmental officials and the public in general, and (3) seeks to stop ongoing unconscionable and unfair conduct that Landlord Defendants are unwilling to stop even after litigation has been commenced.

179.     In addition to the private attorney general statute of Minn. Stat. § 8.31, subd. 3, this claim is brought pursuant to Minn. Stat. § 325F.70, which went into effect on August 1, 2023 and provides Plaintiffs a private cause of action for a claim of unconscionable and unfair acts. Section 325F.70 expressly states that "[a]n action brought under this section benefits the public."

180.     Landlord Defendants' past and ongoing unfair and unconscionable

conduct has caused Plaintiffs injury and damages, and threatens to cause further injury to Plaintiffs, entitling Plaintiffs to the requested remedies in this Complaint.

181. Defendants knew or should have known that their conduct was directed to one or more senior citizens or disabled persons. One or more senior citizens or disabled persons are more vulnerable to Defendants' conduct than other members of the public because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and actually suffered physical, emotional, or economic damage resulting from the Defendants' conduct. Defendants' conduct caused senior citizens or disabled persons to suffer damages. In addition to foregoing damages, Defendants are subject to civil penalties under Minn. Stat. § 325F.71, subd. 2 for each violation.

**COUNT SIX**
**UTILITY BILLING**
**MINN. STAT. § 504B.215**

182. Plaintiffs restate and reallege all other paragraphs in this Amended Complaint as if fully stated and alleged herein.

183. Minn. Stat. § 504B.215 governs a landlord's responsibility to both prospective and current tenants in residential buildings that utilize single-metered utilities.

184. Landlord Defendants are each subject to liability for the statutory violations of § 504B.215 at Haven because each is a "landlord" as defined in Chapter 504B—namely, "an owner of real property, . . . agent, or other person directly or indirectly in control of rental property." Minn. Stat. § 504B.001, subd. 7. Defendant G&I Phoenix is

the owner of the Haven rental property, Defendant Marquette Management and Defendant Delisle are agents of the owner, and all three are persons directly or indirectly in control of the rental property at Haven.

185.    Minn. Stat. § 504B.215, subd. 2a(a), states: "A landlord of a single-metered residential building who bills for utility charges separate from the rent" must, among other things, (1) "provide prospective tenants notice of the total utility cost for the building for each month of the most recent calendar year" and (2) "must predetermine and put in writing for all leases an equitable method of apportionment and the frequency of billing by the landlord."

186.    Minn. Stat. § 504B.215, subd. 2a(b) states that "By September 30 of each year, a landlord of a single-metered residential building who bills for gas and electric utility charges separate from rent must inform tenants in writing of the possible availability of energy assistance from Low Income Home Energy Assistance Program."

187.    Minn. Stat. § 504B.215, subd. 4(2), provides that "[t]he tenant rights under this section may not be waived or modified."

188.    Haven is a "single-meter building" because it is a "multiunit rental building with one or more separate residential living units where the [gas, water, sewer, and trash utility] service measured through a single meter provides service to an individual unit and to all or parts of common areas or other units." Minn. Stat. § 504B.215, subd. 1.

189.    Landlord Defendants have failed to provide to Plaintiffs and other tenants notice of the total utility cost for the building for each month of the most recent calendar

year at the time of entering the lease for separate utility billing for gas, water, sewer, and trash utilities.

190.    Landlord Defendants have failed to predetermine and put in writing for all leases an equitable method of apportionment and the frequency of billing by the landlord for gas, water, sewer, and trash utilities.

191.    Landlord Defendants have failed to inform Plaintiffs and other tenants of the possible availability of energy assistance for tenants' gas utility.

192.    Landlord Defendants' actions caused Plaintiffs injury and damages, and threaten to cause further injury to Plaintiffs, entitling Plaintiffs to the requested relief in this Complaint, including treble damages and reasonable attorneys' fees under Minn. Stat. § 221.

## COUNT SEVEN
### AIDING AND ABETTING
### CONSUMER FRAUD AND UNCONSCIONABLE AND UNFAIR ACTS

193.    Plaintiffs restate and reallege all other paragraphs in this Amended Complaint as if fully stated and alleged herein.

194.    Defendant Doci is aiding and abetting Landlord Defendants' consumer fraud and unconscionable and unfair acts in violation of Minn. Stat. § 325F.69 with respect to their illegal renovation activity at Haven.

195.    To establish aiding and abetting liability for a defendant: (1) the primary tort-feasor must commit a tort that causes an injury to the plaintiff; (2) the defendant must know that the primary tort-feasor's conduct constitutes a breach of duty; and (3) the

defendant must substantially assist or encourage the primary tort-feasor in the achievement of the breach. *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999).

196.     Landlord Defendants' fraud, deception, and unconscionable and unfair acts in violation of Minn. Stat. § 325F.69 with respect to renovation activity are set forth in detail in Counts Four and Five, and Parts B and E of the Facts in this Amended Complaint.

197.     Defendant Doci knows that Landlord Defendants' misrepresentations, deception, and fraudulent omissions to the tenants at Haven regarding renovation activity breach Defendant Marquette's legal duty to Plaintiffs not to engage in acts of fraud, deception, and unfair or unconscionable practice prohibited by Minn. Stat. § 325F.69.

198.     Defendant Doci has provided substantial assistance to Landlord Defendants' in achieving their breach of legal duty to Haven tenants with respect to its illegal renovation by engaging in many of the renovation activities at Haven that violate lead and asbestos safety laws.

199.     The facts and circumstances demonstrating Doci's knowledge and substantial assistance with respect Marquette's fraudulent renovation activity are "the relationship between the defendant and the primary tortfeasor, the nature of the primary tortfeasor's activity, the nature of the assistance provided by the defendant, and the defendant's state of mind." *Witzman*, 601 N.W.2d at 188.

200.    **Relationship between Defendant Doci and Defendant Marquette.** By Doci and Defendant Marquette's own admission, they have a close business "partnership" that has deepened over "nine plus years" in which Doci has never hesitated to "step[] up to help" Marquette "in those unique situations" Marquette finds itself in. Here is the full quote from Marquette's COO Jim Cunningham featured on Doci's website: "We have been working with Doci Construction for over nine plus years and I have to say [it] has been one of the best partnerships Marquette has had. It is truly a partnership in the success of both companies. There has never been a time where Doci hasn't stepped up to help us, especially in those unique situations we find ourselves in."[18] Likewise, Doci's president Alex Doci states on the Doci website that his company developed over the years "working along-side some the premier management companies in and around Chicago, with specializations in interior and exterior renovations"[19]—a clear reference to Marquette Management.

201.    With respect to the renovation activity at Haven, Doci and Marquette function for all practical purposes as an integrated renovation operation. Doci president Alex Doci has made repeated trips to Haven to coordinate renovation activities with Defendant Delisle and Marquette.  Landlord Defendants even allows Doci to use their office at Haven as its Minnesota business office, with Alex Doci working from Delisle's office when he is at Haven. Indeed, Alex Doci identifyies the Haven complex as his

---

[18] https://docicompanies.com/services/
[19] https://docicompanies.com/our-company/

company's Minnesota "registered office address" in its foreign corporation filings with the Minnesota Secretary of State:

**Registered Office Address**
200 Winthrop St S,
St Paul, MN 55119
USA

**Chief Executive Officer**
Alex Doci
1384 Mitchell Blvd
Schaumburg, IL 60139–6013
USA

202.     When Alex Doci is not present at Haven, Delisle directly manages the renovation work by Doci workers at the complex. Delisle and Marquette provide Doci with apartment units in which its workers can live while conducting renovation activities. Doci is allowed to park its construction vans all day and night in the parking lot with strict towing policies. Doci is given full key access to common areas and vacant units that Delisle and Marquette direct Doci to renovate. Increasingly, Doci is performing day-to-day maintenance tasks in addition to conducting renovation activities.

203.     **The nature of Defendant Marquette's illegal renovation activity and the nature of the assistance provided by Defendant Doci.** As described in detail in Part B and in the Expert Report of Greg Myers at Exhibit C, Doci and Marquette have acted together in conducting the illegal renovation activities that are still going on at Haven today. Below are exemplary photos of Doci workers engaged in renovation activity at Haven:







204.    **Defendant Doci's state of mind.** Doci is an experienced construction

company with years of knowledge concerning the lead and asbestos safety laws that

govern renovation in the multi-unit apartment building context. According to Doci's

website, the construction company has "over 15 years of experience" "specializ[ing] in stunning remodeling projects on both single and multifamily projects."[20] Equally important, Doci also operates as a property management business, stating on its website that "Doci Management, also known as Skampa, has been providing warm, yet breathtaking single and multifamily homes since 2010."[21] Thus, as an experienced construction company, Doci is fully aware that the renovation activity it has jointly undertaken with Landlord Defendants at Haven is illegal and hazardous. And as a property management company, Doci is fully aware of Landlord Defendants' legal duties to comply with health and safety law and disclose to tenants if it is engaged in activity that violated these legal duties. Doci is also aware that property managers act as agents of the property owner, and that Haven owner G & I Phoenix is liable for the unlawful acts of its agents.

205. In addition, Defendant Doci was indisputably provided direct legal and factual notice about Marquette's fraudulent misrepresentations and omissions toward its tenants with respect to the renovation activity when served with the initial Complaint in this case in May 2023.

206. Yet rather than stop the renovation activity or begin to comply with health and safety law, Defendant Doci continued to assist Landlord Defendants with their illegal renovation and their ongoing deception of its tenants about that renovation. Indeed, the only change in Doci's conduct after receiving the initial Complaint in May 2023 was to

---

[20] https://docicompanies.com/
[21] *Id.*

make its conduct more secretive—switching out Doci-branded construction vans with unmarked vans; switching out the Doci-branded workers' t-shirts with plain t-shirts; and conducting renovation at Haven late at night and early in the morning to avoid tenant scrutiny. These acts of concealment are themselves additional evidence of Doci's guilty mental state. *See Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 147 (2000).

207.    Defendant Doci's actions caused Plaintiffs injury and damages, and threaten to cause further injury to Plaintiffs, entitling Plaintiffs to the requested relief in this Amended Complaint.

## COUNT EIGHT
## CONSPIRACY TO COMMIT
## CONSUMER FRAUD AND UNCONSCIONABLE AND UNFAIR ACTS

208.    Plaintiffs restate and reallege all other paragraphs in this Amended Complaint as if fully stated and alleged herein.

209.    Landlord Defendants and Defendant Doci have acted in combination with each other to commit unlawful acts through unlawful means with respect to Landlord Defendants' fraudulent, unconscionable, and unfair renovation activity in violation of Minn. Stat. § 325F.69.

210.    The allegations related to the conspiracy's underlying tortious conduct are set forth in detail in Counts Four and Five, and Parts B and E of the Facts in this Amended Complaint

211.    As demonstrated by the facts described in Count Seven, Landlord Defendant and Defendant Doci had a meeting of the minds regarding a common plan and

purpose of action to conduct unlawful and hazardous renovation at Haven and to conceal the unlawful and hazardous renovation from Plaintiffs and the other tenants at Haven.

212.    This conspiracy caused Plaintiffs injury and damages, and threatens to cause further injury to Plaintiffs, entitling Plaintiffs to the categories of remedies discussed in this Amended Complaint.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for relief against Defendants as follows:

1.    Certification of the proposed class under Federal Rule of Procedure 23.

2.    A declaration that Defendants violated each of the laws that form the basis of relief.

3.    A declaration that Defendants' renovation activities at Haven violate lead and asbestos safety laws.

4.    A declaration that Landlord Defendants' charge of apportioned utility fees at Haven violates utility fee law.

5.    An injunction enjoining Defendants from future violations of the laws that form the basis of relief.

6.    An injunction enjoining Defendants from engaging in renovation activities that violate lead and asbestos laws.

7.    An injunction ordering Landlord Defendants to take adequate steps to control and eliminate pest infestation at Haven.

8.     An injunction ordering Defendants to perform all renovation and maintenance  work at Haven in compliance with health and safety law.

9.     An injunction enjoining Landlord Defendants from charging for apportioned utilities in violation of law.

10.     An injunction ordering Landlord Defendants to take affirmative steps to prevent the recurrence of discriminatory acts complained of herein and to eliminate the effects of Landlord Defendants' unlawful conduct.

11.     Compensatory damages including the amount of all rent and fees paid.

12.     Equitable relief in the form of rescission, restitution, and/or disgorgement of all rent and fees paid and charged.

13.     Treble damages for violation of shared meter laws, as provided in Minn. Stat. § 504B.221 for violations of Minn. Stat. § 504B.215.

14.     Reasonable attorneys' fees and costs for litigation and investigation, under multiple statutes identified in this Complaint, as well as Minn. Stat. § 504B.172.

15.     Punitive damages and penalties under the Minnesota Human Rights Act, Minn. Stat. § 549.20, and other statutory and common law grounds in this Complaint.

16.     Enhanced statutory penalties under Minn. Stat. § 325F.71.

17.     A finding that Defendants are jointly and severally liable for damages, equitable relief, and attorneys' fees and costs awarded in this case.

18.     Such other relief that the Court deems just and equitable.

19.     Plaintiffs invoke their right to a jury trial on all claims relevant to a jury

trial.


Date: December 5, 2023                          **HOUSING JUSTICE CENTER**

                                                *s/James W. Poradek*
                                                James W. Poradek (#0290488)
                                                Abigail Hanson (#0402944)
                                                Northwestern Building
                                                275 East Fourth Street, Suite 590
                                                Saint Paul, MN 55101
                                                jporadek@hjcmn.org
                                                612-723-0517
                                                ahanson@hjcmn.org
                                                612-807-1139 ext. 702

                                                **SOMERMEYER SULLIVAN PLLC**

                                                Timothy Sullivan (#0391528)
                                                225 South Sixth Street, Suite 3900
                                                Minneapolis, MN 55401
                                                tsullivan@somsull.com
                                                612-643-3486

                                                **ATTORNEYS FOR PLAINTIFFS**